# IN THE UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| WHEELAND FAMILY LTD. PARTNERSHIP LP, *et al.*, | No. 4:18-CV-01976 |
|---|---|
| Plaintiffs/Counterclaim Defendants, | (Judge Brann) |
| v. | |
| ROCKDALE MARCELLUS LLC, | |
| Defendant/Counterclaim Plaintiff. | |

## MEMORANDUM OPINION AND ORDER

### SEPTEMBER 26, 2019

On July 3, 2019, this Court granted Defendant/Counterclaim Plaintiff Rockdale Marcellus LLC's partial motion for judgment on the pleadings.[1] Plaintiffs now move for reconsideration of that Order and certification for appeal under 28 U.S.C. § 1292(b). The pertinent facts that animate this litigation are well-known to the parties and will not be restated here.[2]

---

[1] Memorandum Opinion, ECF No 44; Order, ECF No 45.
[2] *See* Memorandum Opinion at 1–3.

**I.     Motion for Reconsideration**

   **A.     Standard of Review**

Federal Rule of Civil Procedure 54(b)[3] provides that interlocutory orders "may be revised at any time before the entry of a judgment adjudicating all the claims and all the parties' rights and liabilities." District courts "tend to grant motions for reconsideration sparingly and only upon the grounds traditionally available under Fed. R. Civ. P. 59(e)."[4] To be entitled to relief under Rule 59(e), the "party seeking reconsideration must establish at least one of the following grounds: (1) an intervening change in controlling law; (2) the availability of new evidence that was not available when the court granted the motion for summary judgment; or (3) the need to correct a clear error of law or fact or to prevent manifest injustice."[5]

Plaintiffs argue that the third ground applies here for three reasons: First, that the question of whether the 731-1V Well was properly drilled created an issue of fact; second, that the Court was mistaken in granting judgment on the pleadings on Plaintiffs' implied covenant claim; and third, that this Court's July 3, 2019 Memorandum Opinion did not address arguments pertaining to an alternative "savings clause." As explained below, I deny reconsideration of all three.

---

[3]   Although Plaintiffs cite Rules 59(e) and 60(b), a motion for reconsideration of an interlocutory order is properly brought under Rule 54(b). *See JML Industries, Inc v Pretium Packaging, LLC*, 2007 WL 61061, at *3 (MD Pa Jan 5, 2007). To avoid excessive technical hang-ups, I construe the present motion as if it were brought under that rule.

[4]   *JML Industries*, 2007 WL 61061 at *3.

[5]   *Max's Seafood Café v Quinteros*, 176 F3d 669, 677 (3d Cir 1999).

### B. Discussion

#### 1. The 731-1V Well

In the July 3, 2019 Order and Memorandum, this Court granted judgment on the pleadings on, *inter alia*, Count I of Rockdale's counterclaims. That decision was based on the finding that Rockdale properly exercised its rights to extend Leases 3–7 by invoking the shut-in provisions of those leases.[6]

In the instant motion, Plaintiffs argue that this Court failed to consider their affirmative defense that the 731-1V Well was impermissibly drilled due to defects in the chain of title. According to this argument, if there were a defect in the chain of title, Rockdale and its predecessors may not have had the authority to drill the 731-1V Well, in which case Plaintiffs contend that the pooling of Leases 3–7 into the Marshall Brothers 731 Unit would not have permitted Rockdale to maintain those leases.

I first note that a court is not required to accept conclusory affirmative defenses.[7] While the cited affirmative defense alleges that the well was "impermissibly drilled," nowhere in their Complaint or their judgment-on-the-pleadings papers did they allege the reason why it was impermissible, which they now argue is a title defect. From Plaintiffs' pleadings, Rockdale would not have been

---

[6] *See* Memorandum Opinion at 9.
[7] *See Fesnak and Associates, LLP v US Bank National Association*, 722 F Supp 2d 496, 502 (D Del 2010).

put on notice of an alleged title defect. This bare-bones affirmative defense was therefore not sufficient to create an issue of material fact.[8]

Even accepting the affirmative defense as alleged, the outcome would not change. The purported title dispute over the 731-1V Well centers on whether Rockdale's predecessor drilled a well on property belonging to Marshall Brothers without first obtaining an interest in the Marshall Brothers lease. This alleged conduct may have infringed on the rights of the mineral owners under the Marshall Brothers lease, but it did not infringe on *Plaintiffs'* rights. Plaintiffs cannot enforce rights that do not belong to them.[9]

Furthermore, the leases provided for precisely this situation: "Production, drilling or reworking operations anywhere on a unit which includes all or any part of the leased premises shall . . . be treated as if it were production, drilling or reworking operations on the leased premises."[10] Pursuant to this term, the alleged activity must be treated as if it were properly on the leased premises. Therefore, under the express terms of the relevant leases, concerns about the chain of title are not germane to this dispute.

### 2. Breach of the Implied Covenant

Plaintiffs next reiterate their argument that Rockdale's conduct violated the terms of the leases, a claim confusingly styled as a breach of the implied covenant

---

[8] *Id* at 503.
[9] *See McWreath v Range Resources-Appalachia*, 81 F Supp 3d 448, 464–65 (WD Pa 2015).
[10] Leases 3–7 ¶ 9, ECF Nos 26-12–16.

of good faith and fair dealing.[11] While it is unclear whether Plaintiffs argue for a breach of the implied covenant or a breach of contract, both possibilities were already considered and rejected by this Court.[12] In doing so, I found that Rockdale's pooling was expressly authorized by the leases.[13] The implied covenant cannot override express terms of a contract,[14] and Plaintiffs present no new arguments for breach of contract.

### 3. Savings Clauses

Finally, Plaintiffs argue that the Court failed to address another "savings clause"[15] in the leases and that the determination of which clause applies is fact dependent. Again, this argument was considered and rejected: "[N]owhere do Leases 3–7 condition the application of the shut-in provision on a factual finding as to whether [the 731-1V Well] was capable of producing hydrocarbons in paying quantities. Rather, Rockdale was authorized to invoke the expansive shut-in provision when, among other requirements, the well was 'not producing for any

---

[11] "[I]mplied covenants and express terms of a contract are necessarily mutually exclusive—one can invoke 'implied' terms only when there are no express terms in a contract relating to the particular issue." *USX Corp v Prime Leasing, Inc*, 988 F2d 433, 438 (3d Cir 1993).
[12] *See* Memorandum Opinion at 10–11.
[13] *Id* at 11.
[14] *John B. Conomos, Inc v Sun Co, Inc*, 831 A2d 696, 706 (Pa Super Ct 2003).
[15] While Plaintiffs' motion refers to them as plural "savings clauses," the only savings clause they identified is the continuing operations clause. *See* Leases 3–7 ¶ 8. Plaintiffs also raised ¶ 14, a *force majeure* clause, as a possible alternative savings clause in their briefing on the motion for partial judgment on the pleadings. *See* Plaintiffs' Supplemental Brief in Opposition to Motion for Partial Judgment on the Pleadings 4, ECF No 39. This clause is clearly inapplicable because no *force majeure* is alleged to have occurred.

reason whatsoever.'"[16] Plaintiffs have not cited any authority demonstrating that the finding that the shut-in clause kept the leases in effect was clearly erroneous.[17]

Assume, *arguendo*, that the continuing operations clause did apply. That clause does not affirmatively terminate the leases. Interpreted most generously to Plaintiffs, it provides for one scenario in which that particular clause would not extend the terms of the leases more than "one year beyond the completion of plugging operations or cessation of operations for a non-productive well."[18] At that time, the continuing operations clause would not keep the leases in effect—but the shut-in clause would, and judgment on the pleadings would still be appropriate.

It is understood that Plaintiffs may disagree with this Court's previous ruling, but disagreement standing alone is not sufficient for reconsideration.[19]

## II. Motion for Certification of Interlocutory Appeal

Plaintiffs also move for certification of the July 3, 2019 Order for interlocutory appeal under 28 U.S.C. § 1292(b). Courts strictly construe this statute, and it should be used to facilitate an appeal only in "exceptional circumstances."[20] Plaintiffs must establish three elements before this Court may certify the order: "The

---

[16] Memorandum Opinion at 7.
[17] For further discussion of why Plaintiffs have not demonstrated that this finding was clearly erroneous, *see infra* at 7–9.
[18] Leases 3–7 ¶ 8.
[19] *See Ogden v Keystone Residence*, 226 F Supp 2d 588, 606 (MD Pa 2002) ("A motion for reconsideration is not to be used to reargue matters already argued and disposed of or as an attempt to relitigate a point of disagreement between the Court and the litigant.").
[20] *Burns v County of Cambria*, 788 F Supp 868, 869 (WD Pa 1991).

Order must (1) involve a 'controlling question of law,' (2) offer 'substantial ground for difference of opinion' as to its correctness, and (3) if appealed immediately 'materially advance the ultimate termination of the litigation.'"[21] If those elements are met, the Court has discretion to certify the order.[22]

A substantial ground for difference of opinion exists when controlling authority fails to resolve a pivotal matter.[23] A genuine doubt must exist about the legal standard governing a particular case.[24] The court should not certify questions if the law is "relatively clear."[25]

The controlling question of law that Plaintiffs posit is whether the leases' shut-in clause can control without an inquiry into the production capability of the underlying well. The relevant contractual language reads: "If during or after the primary term of this lease, all wells on the leased premises or within a unit that includes all or part of the leased premises, are shut-in, suspended or ***otherwise not producing for any reason whatsoever*** . . . Lessee may maintain this lease in effect by tendering to Lessor a shut-in royalty."[26] The parties do not dispute that the well was not, in fact, producing.[27] Rather, Plaintiffs allege that the well was capable of

---

[21] *Katz v Carte Blanche Corp*, 496 F2d 747, 754 (3d Cir 1974); *see also In re Chocolate Confectionary Antitrust Litigation*, 607 F Supp 2d 701, 704 (MD Pa 2009).
[22] *See In re Chocolate Confectionary Antitrust Litigation*, 607 F Supp 2d at 708.
[23] *Id* at 705.
[24] *Id* at 706.
[25] *Id*.
[26] See Leases 3–7 (emphasis added).
[27] Complaint ¶¶ 59–60, ECF No 1; Memorandum Opinion at 2.

producing despite its inactivity, and they argue that this factual dispute should have precluded judgment on the pleadings.

In the July 3, 2019 Memorandum Opinion, this Court was persuaded by the reasoning in *Messner v SWEPI, LP*.[28] In that case, this Court interpreted identical contractual terms and, relying on the plain language, concluded that the wells did not need to be capable of producing paying quantities before the lessee could maintain the lease by tendering shut-in royalties.[29] Confronted with the same contractual language, this Court similarly found that the plain terms of these leases did not require the wells to be capable of producing paying quantities.[30] The terms did not "condition the application of the shut-in provision on a factual finding as to whether the [731-1V well] was capable of producing hydrocarbons in paying quantities" because the terms authorized Rockdale "to invoke the expansive shut-in provision when, among other requirements, the well was 'not producing for any reason whatsoever.'"[31]

In the case at bar, Plaintiffs fail to confront this reasoning. Instead, they cite only cases that either address fundamentally different contractual language or do not discuss the contractual language at all. In the lone Pennsylvania case they cite, *T.W.*

---

[28] 2013 WL 4417723 (MD Pa Aug 14, 2013) ("*Messner I*"), affirmed 574 Fed Appx 97 (3d Cir 2014) ("*Messner II*"). For this Court's prior discussion of *Messner*, *see* Memorandum Opinion at 5–9.
[29] *See Messner I*, 2013 WL 4417723 at *4–6.
[30] *See* Memorandum Opinion at 7.
[31] *Id*.

*Phillips Gas & Oil Co v Jedlicka*,[32] the Supreme Court of Pennsylvania interpreted language that, unlike Leases 3–7, expressly required the well to produce in paying quantities in order to extend the lease into its secondary term.[33] Plaintiffs then cite a number of cases from other jurisdictions in which the courts found a requirement that the well be capable of producing paying amounts before the shut-in clause could be invoked. However, the leases in those cases either contained an express condition to that effect or else did not address the issue.[34]

When courts have confronted the language present in Leases 3–7—namely, in *Messner* and *Horton v Chesapeake Appalachia, LLC*[35]—they have concluded that inquiries into the production capabilities of the wells were not necessary.[36] Indeed,

---

[32] 42 A3d 261 (Pa 2012).
[33] *See id* at 264 (interpreting the following habendum clause: "To have and to hold the above-described premises for the sole and only purpose of drilling and operating for oil and gas with the exclusive right to operate for same the term of two years, ***and as long thereafter as oil or gas is produced in paying quantities***, or operations for oil or gas are being conducted thereon, including the right to drill other wells") (emphasis added).
[34] *See Tucker v Hugoton Energy Corp*, 855 P2d 929, 934 (Kan 1993) (provision expressly required that the well be "capable of producing gas"); *Hydrocarbon Management, Inc v Tracker Exploration, Inc*, 861 SW2d 427, 432–33 (Tex App 1993) (same); *Kidd v Hoggett*, 331 SW2d 515, 519 (Tex App 1993) (same); *Maralex Resources, Inc v Gilbreath*, 76 P3d 626, 630–31 (NM 2003) (same); *Bixler v Lamar Exploration Co*, 733 P2d 410, 412 (Okla 1987) (without citing or discussing lease language, remanding case for a determination of whether the well was capable of production in paying quantities); *Levin v Maw Oil & Gas, LLC*, 234 P3d 805, 814 (Kan 2010) (lease did not address whether a well had to be capable of producing in paying quantities and did not allow for delay royalties if well was not producing "for any reason whatsoever"); *Griffin v Crutcher-Tufts Corp*, 500 So2d 1008, 1011–12 (Ala 1986) (same).
[35] 2015 WL 3793250 (MD Pa June 18, 2015).
[36] *See Messner I*, 2013 WL 4417723 at *5–6; *Messner II*, 574 Fed Appx at 98; *Horton*, 2015 WL 3793250 at *7.

in reaching that conclusion, *Messner I* distinguished many of the same cases cited in Plaintiffs' motion.[37]

By today's date, Plaintiffs have exerted great amounts of energy gathering non-controlling authority to the effect that courts may imply a requirement that a well be operational into a shut-in clause that does not contain language to the contrary. They have not, however, demonstrated that this Court must read in these *implicit* terms to override the *express* language present here—that the lessee may maintain the lease by tendering the shut-in royalty if the well is not producing "for any reason whatsoever."[38] This language, the plain language of the leases, does not condition application of the shut-in clause on whether the 731-1V Well was capable of production. Plaintiffs' efforts have not established that a substantial ground for difference of opinion exists here.

Nor would certification of this order "materially advance the ultimate termination of the litigation."[39] This element may be met if an appeal could "eliminate the need for a trial, simplify a case by foreclosing complex issues, or enable the parties to complete discovery more quickly or at less expense."[40] While

---

[37] *See Messner I* at *5–6 (distinguishing *Levin*, *Bixler*, *Maralex*, *Tucker*, and *Hydrocarbon Management*).

[38] *See Smith v Allstate Corp*, 2012 WL 2849258, at *7 (ED Pa July 11, 2012) ("An implied duty arising from the contract cannot supercede an express contract term."); *Northview Motors, Inc v Chrysler Motors Corp*, 227 F3d 78, 91 (3d Cir 2000) ("Courts have utilized the [implied] good faith duty as an interpretive tool . . ., but that duty is not divorced from the specific clauses of the contract and cannot be used to override an express contractual term."); *USX*, 988 F2d at 438.

[39] *Katz*, 496 F2d at 754.

[40] *In re Chocolate Confectionary Antitrust Litigation*, 607 F Supp 2d at 707.

judgment on the pleadings was granted on the claims pertaining to Leases 3–7, claims involving Leases 1 and 2 remain. An interlocutory appeal would therefore not obviate the need for a trial or the accompanying discovery into Rockdale's operations.[41] Furthermore, appellate treatment of a relatively straightforward issue of contract interpretation would not greatly simply the issues for trial. Simply put, this is not the exceptional case where it is appropriate to invoke § 1292(b) "in the face of the strong federal policy against piecemeal appeals."[42]

For the foregoing reasons, **IT IS HEREBY ORDERED** that Plaintiffs' Motion to Correct July 3, 2019 Order (ECF No 46) and Motion for Certification of Interlocutory Appeal and Stay of Case Pending Appeal Pursuant to 28 U.S.C. § 1292(b) (ECF No 49) are both **DENIED**.

BY THE COURT:

*s/ Matthew W. Brann*
Matthew W. Brann
United States District Judge

---

[41] *See Titelman v Rite Aid Corp*, 2002 WL 32351182, at *3 (ED Pa Feb 5, 2002) ("Regardless of the outcome of an appeal on the fraud issue, trial on the remaining contract issues will most likely be necessary. . . . Although some duplicative discovery and even a second trial might occur if the Court's Order is overturned on appeal after the contract claims have been fully adjudicated, this possibility must be weighed against the possibility that the Third Circuit would not reverse, meaning that the case would be unnecessarily delayed pending the interlocutory appeal.").

[42] *Id*.